**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RUSSELL LYNN RAYMER, | § | |
| (TDCJ-CID #1385962) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1338 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND OPINION**

The petitioner, Russell Lynn Raymer, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a 2006 state felony conviction for aggravated robbery. The respondent filed a motion for summary judgment, (Docket Entry No. 16), with a copy of the state court record. Raymer filed a response. (Docket Entry No. 19). Based on careful consideration of the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons for these rulings are set out below.

**I.    Background**

A jury found Raymer guilty of the felony offense of aggravated robbery. (Cause Number 05-04416-CRF-272). Raymer pleaded true to the enhancement paragraphs alleging a prior conviction in Cause Number 05-04416-CRF-272. On July 13, 2006, the court sentenced Raymer to a 68-year prison sentence.

The Tenth Court of Appeals of Texas affirmed Raymer's conviction on July 23, 2008. That court summarized the evidence, as follows:

> On the afternoon of April 4, 2005, Mary Garcia was working as the
> assistant man[a]ger at the Handi–Stop convenience store in Bryan,

Texas. That day, a white male wearing a homemade black mask, a plaid shirt, and yellow rubber gloves entered the store. The robber pointed a sawed-off shotgun at Garcia and demanded cash. Garcia gave him $200 from the register; the robber placed the money in a yellow Dollar General bag and fled. Garcia called the police and later described the man as a skinny white male, around 5'7", with blue eyes, and light brown eyebrows. Francis Guevara lived next door to the Handi–Stop. Near the time of the robbery, she saw a man sitting in the driver's seat of a truck. She then watched as another male came running from the direction of the store. He was carrying a yellow Dollar General bag, and when he jumped a fence, she saw money fall out of the bag. After returning to retrieve the money, he entered the passenger side of the truck. Guevara was able to memorize the license plate number and later gave it to police.

When police first attempted to check the license plate number, it was not valid. Officer Curtis, believing that Guevara may have mistaken a letter such as a zero for the letter "O," changed one of the letters and the dispatcher responded that the license plate number matched that of a green truck.

After locating the vehicle, officers attempted to stop the truck on a traffic violation and a high-speed chase ensued. Raymer was driving the truck at the time and was the only occupant; he eventually stopped the truck and was apprehended when he tried to run away on foot. Raymer was taken to jail and booked, where he was found to have $159.14 in his possession. Police later searched his vehicle and found a plaid shirt, a mask, yellow rubber gloves, and loaded sawed-off shotgun.

Detective Darrell Fikes testified that he obtained a custodial statement from Raymer in which he admitted to committing the robbery at the Handi–Stop, with an accomplice, Shane Weldon. Raymer claimed that Weldon was the get-away driver and that he committed the robbery because he owed Weldon $2,000 for drug purchases. Fikes also testified that Raymer admitted to committing a robbery at Tobacco & More, a store in Bryan, Texas, two days before the robbery at the Handi–Stop. He testified that Raymer told him that the shotgun he used in the robbery was the same one recovered from his truck. He also implicated Weldon as having participated in several other robberies in the area. A videotape of the Tobacco & More robbery was admitted into evidence and played for the jury.

Raymer took the stand and argued that he was denied food when he made his confession. He also denied any involvement in the

> robberies of both the Handi–Stop and Tobacco & More.  He further
> argued that it was Weldon who committed the robberies, and that he
> gave a false confession because he was under the influence of drugs.
> Raymer admitted that he had previously been sentenced to prison for
> several different theft and burglary convictions.

*Raymer v. State,* No. 10-06-00354-CR, 2008 WL 2840882, at *1-2 (Tex. App. – Waco 2008, pet.

ref'd) (not designated for publication).

On June 7, 2007, Raymer filed his first state habeas application challenging his conviction.

The application was dismissed because his direct appeal was pending.  *Ex parte Raymer*,

Application Number 48,857-02 at cover.  On December 22, 2008, Raymer filed his second state

habeas application, requesting permission to file an out-of-time petition for discretionary review

(PDR), which the Texas Court of Criminal Appeals granted.  *Ex parte Raymer*, AP-76,126.  On

August 19, 2009, the Court of Criminal Appeals refused Raymer's request.  *Raymer v. State*, P.D.R.

No. 0526-09.

On November 15, 2010, Raymer filed a third state habeas application.  *Ex parte Raymer*,

Application Number 48,857-04 at cover.  On July 3, 2013, the Court of Criminal Appeals denied

the application without written order.  *Id*. at cover.

On May 6, 2013, this court received Raymer's federal petition.  Raymer contends that his

conviction is void for the following reasons:

(1)     Trial counsel, Bruno A. Shimek, rendered ineffective assistance of counsel by:

(a)     failing to file a motion for an expert witness;

(b)     failing to interview eyewitnesses;

(c)     failing to challenge five jurors for cause; and

(d)     failing to object to improper statements made by the prosecutor during
closing argument.

(2)     Raymer's right to a fair trial was violated by the use of his involuntary statement.

3

(3)     His due process rights were violated by the prosecutor's prejudicial comments during voir dire.

(4)     His Sixth and Fourteenth Amendment rights to confront witnesses against him were violated.

(5)     Appellate counsel rendered ineffective assistance of counsel by:

(a)     failing to raise the issue of the court's improper admission of hearsay testimony; and

(b)     failing to raise the issue of a Confrontation Clause violation.

(6)     His Fifth Amendment right was violated by the use of a statement given under the influence of drugs and alcohol.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-25).  Each claim is considered below.

## II.     The Applicable Legal Standards

This court reviews Raymer's petition for writ of habeas corpus under the federal habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).  Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits."  An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural."  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

The AEDPA provides as follows, in pertinent part:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

4

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)   In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and of mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  In deciding whether a state court's application was unreasonable, this court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000).  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the state court's implicit findings as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) — which mandates that findings of fact made by a state court are "presumed to be correct" — overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Raymer is a *pro se* petitioner. *Pro se* habeas petitions are construed liberally and are not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988);

*Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981).  This court broadly interprets Raymer's state and federal habeas petitions.  *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## III.     The Claim of Ineffective Assistance of Trial Counsel

To establish an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that he was actually prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 68 (1984).  Whether counsel's performance was deficient is determined by an objective standard of reasonableness.  *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999).  "[S]crutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.  "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id*. at 690-91; *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir.) ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."), *cert. denied*, 537 U.S. 1018 (2002); *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (*Strickland* requires deference to counsel's "informed strategic choices").  "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance."  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *Jones*, 287 F.3d at 331.  A petitioner must show that his counsel "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client."  *Id*.; *see also Moore v. Johnson*,

194 F.3d 586, 615 (5th Cir. 1999) ("*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose.").

Even if a petitioner establishes that his counsel's performance was deficient, he must also establish that "prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different." *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997). A petitioner must show that the deficient performance made the trial outcome "fundamentally unfair or unreliable." *Id*. (quoting *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

The state habeas court found that:

> Applicant's trial attorney, Bruno A. Shimek, filed his affidavit on September 4, 2012. *See* Exhibit No. 4. . . .
>
> (I)   Shimek's affidavit is thorough, consistent with the record, and credible. This Court is familiar with Shimek as an experienced criminal defense attorney in this County. Shimek's affidavit provides this Court sufficient information to address Applicant's claims, and to the extent the assertions of Applicant and Shimek conflict, this Court finds Shimek more credible than Applicant.

(Docket Entry No. 11-19, p. 52).

Under AEDPA, this court must give deference to the state court's determination that trial counsel rendered effective assistance. *See Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). Because the state court properly identified *Strickland* as the governing legal principle, the "unreasonable application" prong of § 2254(d)(1) provides the standard that governs this court's review of the state court's decision on Raymer's ineffective counsel claims. *Bell v. Cone*, 535 U.S. 685, 694-695 (2002). The issue is whether the state court's application of *Strickland* was objectively unreasonable. *Id*.; *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1104 (2003). Under section 2254(d)(1), "[w]e have no authority to grant habeas corpus relief

8

simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal*, 286 F.3d at 236). "The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

### A. The Claim that Counsel Failed to Call an Expert Witness

Raymer asserts that trial counsel, Shimek, provided ineffective assistance by failing to file a motion to have his own expert appointed to testify that a person who consumes alcohol and drugs for three days would be too impaired to give a knowing, intelligent, and voluntary statement. Raymer contends that the only evidence presented to the jury was his own statement. He argues that had Shimek filed his own motion to retain an expert, he could have shown the jury that Raymer's confession was involuntary because he had been up for three days drinking and doing drugs. Raymer offered the statement of Penney J. Davis, who opined that someone who had been consuming ecstasy, cocaine, and alcohol for three days likely did not know what he was doing when he gave a statement to the police. Raymer offered a second statement, by Amber C. Leichtle, opining that it was unjust and unethical to interrogate a person who is under the influence of alcohol, cocaine, and ecstasy. Raymer argues that had Shimek presented these expert witnesses, the jury would have disregarded his confession and acquitted him in light of other evidence pointing to Shane Weldon as the sole perpetrator.

On state habeas review, Shimek submitted an affidavit in which he testified in part as follows:

> Raymer next complains of the failure to obtain an expert witness to contest the admission of his statement as involuntary. I did not seek expert counsel on that matter however the issue of intoxication was brought up throughout the suppression hearing. Mr. Raymer in

9

February of 2010 obtained letters from Penny Davies Phd. [a]nd Amber C. Leichtle alleging that the confessions should not have been admissible due to Raymer's use of cocaine, ecstacy[sic], and alcohol. They offer no reason other than a personal opinion that a person using drugs prior to commission of an offense does not know what they are doing in making a statement. Their letters do not have any scientific basis and their opinions unless they could support them would not be admissible. Nor did any of the case law at the time support the proposition that a confession is rendered inadmissible solely based on the ingestion of illegal narcotics and alcohol. The court had the opportunity to review the video evidence and did so, though I disagreed with his ruling on the Motion to Suppress[.] I do not believe, based on his opinion in the ruling that the outcome would have been different had an expert been called to testify about the effects if any of a person making a statement after being intoxicated on illegal substances or alcohol.

(Docket Entry No. 11-20, pp. 15-16).

The state habeas court found as follows:

(gg)   Shimek, in his affidavit, notes that the law did not support challenging the admissibility of the confession solely on the basis of ingesting illegal narcotics and alcohol. *See* Shimek affidavit at 5. He disagrees with this Court's determination that the circumstances did not show voluntariness, but acknowledges that the judge took the opportunity to review all of the evidence. *Id.* Shimek also reviewed Applicant's attached affidavits submitted to support that expert testimony was necessary. *Id.* He noted deficiencies in their affidavits and does not believe expert testimony on the effects of intoxication would have changed the result of the motion to suppress. *Id.*

(hh)   The affidavits Applicant attaches state only that a person under the influence of drugs and alcohol cannot make a voluntary confession because it impairs their ability to understand. *See* Application at Exhibits B and C. Their assertions contain only general conclusions and include no information specifically based on the facts of Applicant's case or detail Applicant's level of intoxication at the time of his interviews. *See Gonzalez v. State,* 301 S.W.3d 393, 397 (Tex. App. – El Paso 2009, pet. ref'd) (finding expert testimony on confession and withdrawal symptoms properly excluded as unreliable and irrelevant because it was not specifically based on the facts of the case). Further, as Shimek noted[,] the failure to include any basis to support their opinions do not provide admissible expert testimony. *See Green v. State,* 55 S.W.3d 633, 640

10

(Tex. App. – Tyler 2001, no pet.) (upholding a trial court's decision to exclude an expert who failed to provide authorities in the field or authorities supporting his analysis). Finally, even had the experts appeared and sought to proffer their opinions at trial, this Court could have properly concluded that their expert testimony was not necessary to assist it in providing specialized knowledge to understand the evidence. *See* TEX. R. EVID. P. 702; *Massengale v. State,* 710 S.W.2d 594, 595 (Tex. Crim. App. 1986) (holding the trial court was in a position to judge whether the defendant's will had been overborne without an expert); *Douglas v. State,* No. 01-98-01151-CR; 2001 WL 1048533 (Tex. App. – Houston [1st Dist.] Aug 31, 2001, pet. ref'd) (not designated for publication) (holding factors that would affect the voluntariness of a confession to be within the realm of knowledge of the average layperson in determining whether a statement is involuntary).

(ii) Applicant has not established that he was intoxicated to the extent it rendered him incapable of making an independent, informed choice of his free will, notwithstanding that he may have consumed drugs and alcohol the days before he committed the offense. *See Nichols v. State,* 754 S.W.2d 185, 190 (Tex. Crim. App. 1988), *overruled on other grounds by Harris v. State,* 784 S.W.2d 5 (Tex. Crim. App. 1989) (holding that when the record reflects evidence of narcotics, medications, or other mind-altering agents, the question becomes whether those intoxicants prevented the defendant from making an informed and independent decision to waive her rights).

(jj) Applicant's claim that his confession was not voluntary, presented in the motion to suppress, encompassed more factors than solely Applicant's purported intoxication, and Shimek's decision that he did not require expert testimony to support the motion to suppress was a strategic decision based on the law and his experience. *See* Shimek affidavit at 4-5. Applicant has not established that Shimek provided deficient performance. *See Thompson,* 9 S.W.3d at 813.

(kk) Applicant has not established that had Shimek presented expert testimony regarding his intoxication from his drug use over the three days prior to the offense would have persuaded this Court that Applicant's interviews were involuntary due to his intoxication in light of its review of Applicant's review of the testimony and interviews. *Id.*

(Docket Entry No. 11-19, pp. 57-59).

11

"When one reasoned state court decision rejects a federal claim, subsequent unexplained orders upholding that judgment or rejecting the same claim are considered to rest on the same ground as did the reasoned state judgment." *Bledsue v. Johnson,* 188 F.3d 250, 256 (5th Cir. 1999). This "look through" doctrine enables a federal habeas court "to ignore—and hence, look through—an unexplained state court denial and evaluate the last reasoned state court decision." *Id.; see also Renz v. Scott,* 28 F.3d 431, 432 (5th Cir. 1994) (finding that the denial of relief "on the findings of the trial court" by the Texas Court of Criminal Appeals adopts an express finding by the trial court that a claim was procedurally barred from habeas review); *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

The Texas Court of Criminal Appeals denied without written order Raymer's state habeas application raising this claim. Because the state habeas court issued the last reasoned opinion on this matter, this court "looks through" the Texas Court of Criminal Appeals order to the state habeas court's decision. *See Henderson v. Cockrell,* 333 F .3d 592, 598 (5th Cir. 2003). The state court's detailed findings of fact and conclusions of law refuting Raymer's allegations of ineffective assistance in response to his state habeas application apply under the "look through" doctrine. *Jackson v. Johnson,* 194 F.3d 641, 651 (5th Cir. 1999).

The state habeas court found the facts stated in trial counsel's affidavit to be true and concluded that Raymer had received reasonably effective assistance of counsel. (Docket Entry No. 11-19, pp. 51-66). The Court of Criminal Appeals implicitly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moore v.*

*Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g).  Raymer has not produced clear and convincing evidence to rebut this presumption.

Counsel's decisions on presenting evidence and witnesses are essentially strategic. Complaints of uncalled witnesses are disfavored because presenting testimony is a matter of trial strategy.  *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000) (citing *United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983)).  The record provides no basis other than speculation to support Raymer's argument that the trial outcome would have been different had counsel offered expert testimony on the effect of Raymer's three-day drug use before he talked to the police.  The potential additional expert evidence Raymer identifies does not present such uncontradicted or overwhelming support for his excuse for confessing to the robbery or for finding it involuntary as to make it likely that the jury would have reached a different result.  The state court's decision that counsel gave effective assistance reasonably applied the law to the facts, consistent with clearly established federal law.  Raymer has not shown a basis for relief on this ground.  28 U.S.C. § 2254(d)(1).

### B.    The Claim that Counsel Failed to Interview Witnesses

Raymer alleges that Shimek rendered ineffective assistance for failing to interview eyewitnesses to the crime.  The State called Mary Garcia, who testified that she was working as the manager at the Handi-Stop the day of the robbery and saw the crime.  On direct examination, she testified that the robber was wearing a mask and she could see only his brown eyes.  On cross-examination, Shimek questioned Garcia about a prior statement she gave to the police telling them that the robber had blue eyes and blonde hair.  Raymer argues that had Shimek interviewed Garcia before trial, he could have had prepared to show her a picture of Shane Weldon (who had blue eyes) and a copy of the probable-cause affidavit.

13

Raymer also alleges that Shimek was ineffective in failing to interview another eyewitness, Nat Rodriquez, who the defense called.  Rodriquez testified that he looked the robber in the eyes and saw that they were blue.  Vigorous cross-examination did not sway Rodriquez from this description.  Raymer alleges that had Shimek interviewed Rodriquez before trial, he could have shown Rodriquez a picture of Shane Weldon and his blue eyes.

The defense also called Francis Guevera, another eyewitness.  She testified that she did not recall that the person who ran out of the store shirtless had any tattoos on his body.  Raymer argues that Shimek should have interviewed her before trial and shown her a picture of Raymer, whose arms are covered in tattoos, and shown her a picture of Shane Weldon, who had no tattoos.  Raymer argues that if Shimek had interviewed these witnesses before trial, they would have identified Shane Weldon as the robber.

The affidavit Shimek submitted on state habeas review contained the following paragraphs:

> In his third ground [Raymer] alleges ineffectiveness for failing to interview witnesses.  This ground is baseless in that I did go to the Handi-Stop prior to the trial and I did interview Mary Garcia about the robbery.  Further I found, talked to, and called Nat Rodriguez[sic] as a defense witness.  Mr. Rodriguez[sic] clearly testified that the robber had blue eyes.  Mr. Raymer does not have blue eyes and Mr. Rodriguez[sic]'s testimony was intended to show that there was a mistake in identification of the robber.  Mrs. Guevara was recalled to stress the fact that she did not see any tat[t]oos on the person running from the robbery.  Raymer's booking photo showing him shirtless was introduced to show the presence of tat[t]oos on Raymer's body.  The jury was presented that evidence but unfortunately for Mr. Raymer in deciding the case the jury did not find beyond a reasonable doubt that this testimony and physical evidence was enough to acquit the defendant.

(Docket Entry No. 11-20, pp. 16-17).

The state habeas court rejected Raymer's claim, finding as follows:

> (ll)    In ground three, Applicant claims that his trial attorney rendered ineffective assistance because he did not interview

14

eyewitnesses to the crime.  *See* Application at 8.  Had counsel interviewed the witnesses to the robbery before trial, he could have shown pictures of Weldon to support statements[] that the robber had blond hair, blue eyes, and no tattoos, which were more consistent with Weldon than Applicant.  *Id.* at 8-8A.

(mm)   Shimek did interview the witnesses Applicant claims he did not.  *See* Shimek affidavit at 5-6.  In fact, one of the witnesses, Rodriguez[sic], was a defense witness called by Shimek.  *Id.*  Shimek questioned each of the witnesses that Applicant names to support an argument that Applicant did not match characteristics identifying him as the robber.  *Id.*  Shimek presented all of the discrepancies to the jury, recalled a State's witness, and introduced Applicant's booking photo, showing him as 5'8" with hazel eyes and tattoos.  *Id; see also* (5 RR 31); Defense Exhibit No. 3.

(nn)   Although in retrospect Applicant's claims that Shimek should have focused on Weldon as the robber, rather than attempting to show that there was a general mistake in identification of the robber, he fails to establish the strategy was unsound: Shimek urged misidentification from his opening statement (4 RR 14) and pointed to names of potential suspects who were never investigated (5 RR 43), while the store surveillance video does not appear to match the much bigger, 6'2" and 260 lbs., Weldon.  (4 RR 152-54).

(oo)   Shimek did not fail to interview the witnesses that Applicant claims he did not, and he elicited all of the information Applicant used to argue that he was misidentified; thus, he cannot establish that Shimek provided deficient performance.  *See Ex parte Martinez,* 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006) (noting that a failure to satisfy one prong of the two-part test for ineffective assistance of counsel negates a court's need to consider the other).

(Docket Entry No. 11-19, pp. 59-60).

Raymer's claim that Shimek was ineffective in failing to conduct pretrial interviews of the three eyewitnesses fails because the state court found that Shimek had interviewed these witnesses. To the extent Raymer challenges Shimeks's strategy in questioning the witnesses, his claim also fails.  Shimek's strategy was to show that Raymer had been misidentified as the robber.  Shimek cross-examined Mary Garcia  about her statement to police that the robber had blonde hair, light-colored eyebrows, and light blue eyes.  Shimek cross-examined Detective Fikes about the

description of the robber Mary Garcia and Nat Rodriguez provided.  Both described the person as having blonde hair and blue eyes.  (Docket Entry No. 10-12, p. 20).

Raymer elected to testify as well.  Shimek asked him about his eye color:

> Q.    What color are your eyes?
>
> A.    They're brownish hazel. Hazel brown, depending on my mood.
>
> Q.    Has anybody ever told you your eyes were blue?
>
> A.    No, sir.
>
> MR. SHIMEK:  Judge, may I have him approach the jury?
>
> THE COURT:  All right. (Defendant stands in front of the jury box.)
>
> Q.    (By Mr. Shimek) Mr. Raymer Russell, would you look at the jury in the eye?  (Witness complies.)

(Docket Entry No. 10-13, p. 21).  Raymer also testified that he had tattoos on his upper left arm, upper right arm, upper left breast, inner left forearm, and back.  (Docket Entry No. 10-13, p. 25).

Shimek called Francis Guevara as a defense witness.  She testified that the man she saw running was not wearing a shirt and had no marks or tattoos on his body.  (Docket Entry No. 10-12, p. 26).  Shimek called Nat Rodriquez as a witness.  Rodriquez testified that he was leaving the Handi-Stop store on April 4, 2006 when the robber entered, only a few feet away.  The robber looked directly at Rodriquez, who saw that he had blue eyes.  (Docket Entry No. 10-12, p. 27).  The witnesses Shimek called and the questions he asked them were consistent with the strategy of showing that Raymer was not the robber.

The state court's decision that Shimek provided effective assistance reasonably applied the law to the facts, consistent with clearly established federal law.  Raymer has not shown a basis for relief on this ground.  28 U.S.C. § 2254(d)(1).

16

### C.    The Claim that Counsel Failed to Strike Biased Jurors

Raymer alleges that Shimek rendered ineffective assistance by failing to challenge five jurors for cause.  During voir dire, the prosecutor, Raymond Thomas, asked the venire if any had been the victim of a violent crime.  In response, juror 31, juror 34,  juror 6,  juror 10, and juror 22 all indicated that they or a family member had been the victim of a violent crime.  Raymer argues that it was ineffective assistance for Shimek not to object or challenge these five jurors for cause. Raymer alleges that all five were placed on the jury and that it would have been "nearly impossible" for them to put personal feelings aside and decide the case fairly.

On state habeas review, Shimek submitted an affidavit in which he testified as follows:

> Fourth Mr. Raymer challenges my effectiveness in jury selection siting[sic] five jurors in particular that he feels should have been challenged for cause. . . . These jurors all indicated that they or a family member had been a victim of a crime.  [Juror 31]testified that she had been a victim of a[n] Aggravated Robbery at a bar.  She however reiterated that she would not be effected [sic] in this case by what had happened to her.  Juror [34] had been the victim of a home invasion robbery.  He said that he may be effected [sic] by his experience on punishment, however he was brought up on individual voir dire and clearly indicated that he could consider the full range of punishment.  [Juror 6] testified that he had worked at a movie theater 15 minutes before it was robbed by two co-workers.  He was not present when the robbery occurred but had expressed sympathy for one of the robbers who had been unfairly treated by the state.  He felt that the rich guy got off and the poor guy had to suffer.  He appeared that he would be a good juror for the defense.  Further I explained to Raymer that I had been involved in the former case and knew the outcome.  Because of this we decided to keep him as a juror.  Juror [10] testified that his father had been a victim of an armed robbery. He testified that he would not be affected.  Further, he was a prison guard and we discussed that prison guards can be good on punishment because they truly understand the length of a prison sentence and are therefore somewhat more lenient.  Juror [22]'s parents were also the victim of a home invasion.  He testified that he would not be effected [sic] unless it was a home invasion similar to that of his parents.

Five jurors were released prior to selection.   Three jurors by agreement and one challenge was sustained by each side.  Based on each of the challenged jurors' answers, I do not believe a challenge for cause would have been granted based on the evidence even if it was made.  Normally I retain my jury chart in my files to review why each strike was made and why other jurors were kept.  Although I have found what I believe to be my entire file, my jury chart is not in the file.  The practice that I always do when selecting a jury is to go over each individual potential juror with my client.  I know I did this with Mr. Raymer.  We review each statement as well as the jury information sheet before making our 10 strikes.  In hindsight looking at a cold record I guess it can be speculated as to why these jurors were not struck, but there was a reason they were kept just as there was a reason the strikes we made were made.  Picking a jury is not an exact science, each juror selected or not struck for a particular purpose.  Mr. Raymer was at my side when the strikes were made with his full knowledge.

(Docket Entry No. 11-20, pp. 17-19).

The state habeas court found as follows:

(pp)   In ground four, Applicant claims that his trial attorney rendered ineffective assistance of counsel because several jurors had involvement in a violent crime and he did not challenge them for cause.  *See* Application at 9.

(qq)   Shimek explained that he always goes over each individual juror with his client when selecting a jury, reviewing each statement made at voir dire and the juror information cards.  *See* Shimek affidavit at 6-8.  Although he was unable to locate his jury chart, he knows each of his strikes was chosen for a particular purpose, and Applicant was at his side and with full knowledge when the strikes were made.  *Id.* at 7-8.  Shimek also could recall the five jurors Applicant claims he should have struck.  *Id.* at 6.-7.  He agrees that the jurors Applicant specifies all indicated that they or a family member had been a victim of a crime.  *Id.* at 6.  However, in contrast to the jurors that were released prior to selection, Shimek did not believe a challenge for cause would have been granted based upon their answers.  *Id.*  Further, the voir dire examination provided other reasons that suggested they would make good jurors for the defense.  *Id.* at 5-6.

(rr)   A strategic decision not to challenge a juror and allow them to remain on a panel does not constitute deficient performance.  *See State v. Morales,* 253 S.W.3d 686, 698 (Tex. Crim. App. 2008)

(finding a tactical decision to leave an assistant district attorney on a panel preferable to empanel[]ing other prospective jurors not deficient); *Delrio v. State,* 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (holding trial counsel's failure to challenge for cause a venire member who admitted bias fell within plausible trial strategy and was not ineffective assistance of counsel).

(ss)     The record also supports Shimek's belief that challenging the jurors for cause would have been unsuccessful:

- [Juror 31] was the victim of a robbery while she was playing pool, but she stated that nothing about that experience would cause her to have bias against Applicant in this case.  (2 RR 45).

- [Juror 34 had some personal feelings when it came to punishment based on his experience.  (2 RR 38).  Upon being questioned individually, he stated that he did not like the low end of punishment for a habitual felony, but he believed that twenty-five years was a long sentence and could consider it.  (2 RR 132).

- [Juror 6] had been the victim of an aggravated robbery, but he worked with and was friends of the defendants, believing the poor guy got the short end of the stick and the rich one got off.  (2 RR 99).  He could see both sides, and "if the evidence shows guilt, then guilt it is.  If it doesn't, then let them walk." (2 RR 100-101).

- [Juror 10]'s father was robbed at gunpoint in the seventies, and it would not affect his judgment at all: "It was just something that happened."  (2 RR 101-102).

- [Juror 22] was the victim of a recent home invasion where someone broke into the house and took credit cards and checks, but it would make no difference unless the details of the case were terribly similar.  (2 RR 102).

Because the jurors all indicated that they could follow the law, the trial court would have acted within its discretion to deny a challenge for cause.  *See Swearingen v. State,* 101 S.W.3d 89, 99 (Tex. Crim. App. 2003) (noting that review of a denial of a request to exclude a juror for cause affords heightened deference to the trial court potential jurors' statements are not clearly objectionable or are equivocal).

        (tt)     Shimek's determination that the prospective jurors were not objectionable was a matter of sound trial strategy, and his decision not to seek to eliminate the prospective jurors for cause did not establish that he provided deficient performance. *See Martinez,* 195 S.W.3d at 730.  Applicant's knowledge and input in discussing the desirability of seating the jurors establishes his complaints are an inappropriate attempt to second-guess his decisions in hindsight. *See Miniel,* 831 S.W.2d at 323 (Tex. Crim. App. 1992).

(Docket Entry No. 11-19, pp. 60-62).

Actual bias is an issue of fact.  *Id.* at 610 n.52 (citing *Patton v. Yount,* 467 U.S. 1025 (1984)).  A court looks to a juror's own indication that she has "such fixed opinions that [she] could not judge impartially respondent's guilt," *Patton,* 467 U.S. at 1035, and asks whether "her views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and oath," *United States v. Scott,* 159 F.3d 916, 925-26 (5th Cir. 1998).  Whether jurors have disqualifying experiences or beliefs is a question of "historical fact," *Patton,* 467 U.S. at 1037.  Under AEDPA, a federal court may reject the state court's fact findings only if the habeas applicant clearly and convincingly rebuts the presumption of correctness.  28 U.S.C. § 2254(e)(1).

The state habeas court found that Raymer's claim that his attorney was ineffective for failing to strike biased jurors lacked merit because the record indicates that the members of the jury all indicated that they could be fair and impartial.  Reviewing the transcript of the voir dire, and the statements of each challenged juror shows no basis to find actual bias.  Comparing the responses of juror 31, juror 34, Bill Harper, juror 6, juror 10, and juror 22  to those in cases in which courts have found actual juror bias, this court cannot conclude that the state court's finding was "an unreasonable determination of the facts."  28 U.S.C. § 2254(d).

The next analytical step is to evaluate whether trial counsel's failure to challenge jurors was justified by trial strategy.  Under *Strickland,* "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  466 U.S.

at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)).  Generally, an "attorney's actions

during voir dire are considered to be a matter of trial strategy." *Teague v. Scott,* 60 F.3d 1167, 1172

(5th Cir. 1995).  Shimek's affidavit, which the state habeas court credited, shows that his decisions

on striking jurors for cause presented no conflict with his trial strategy.  Raymer was present during

voir dire and had an opportunity to participate in the jury selection process.  When an ineffective

assistance of counsel claim involves jury selection, courts recognize that trial counsel's experience

and intuition are critical, drawing on insights available only through physical presence. *See Romero*

*v. Lynaugh,* 884 F.2d 871, 877 (5th Cir. 1989).  There is no basis to find that Shimek's decision not

to challenge jurors 6, 10, 22, 31, and 34 for cause fell below an objective standard of reasonable

performance.  The record does not show that any of these jurors was actually biased.  There is no

basis to find a reasonable probability that a challenge for cause would have been granted had it been

raised, or that the result would have been different with other jurors. *Strickland,* 466 U.S. at 694.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the

facts, consistent with clearly established federal law.  Raymer has not shown a basis for relief on this

ground.  28 U.S.C. § 2254(d)(1).

**D.      The Claim that Counsel Failed to Keep Out Detective Fikes's Hearsay**
**Testimony and to Object to the Prosecutor's Closing Argument**

Raymer asserts that trial counsel rendered ineffective assistance by failing to object to

statements by Detective Fikes about what he learned from employees at a store Raymer visited and

the employees' identification of Raymer in a photo lineup.  Raymer also asserts that trial counsel

was deficient in failing to object to the following statements during the prosecutor's closing

argument:

> PROSECUTOR:  Why is that important?  Because the people at the
> Dollar General store, as you heard from Detective Fikes, say they saw
> the defendant buying these gloves.  They picked him out.

(R.R. Vol. 6, p. l9).

PROSECUTOR: You have the Dollar General, who show what looks like a random violent act was in fact a planned violent act.
(R.R. Vol. 6, p. 41).

PROSECUTOR: Dollar General confirms he's in there buying them.
(R.R. Vol. 6, p. 49).

PROSECUTOR: He just shopped at Dollar General to get the yellow gloves. And a Dollar General bag was found in his apartment.
(R.R. Vol. 6, p. 50).

PROSECUTOR: The video. One thing that you can tell on the video is that a person is talking. Now, Detective Fikes — a guy with no dog in the fight, a guy that works major crimes, not dirty urine cases— gave the defendant every chance to name somebody else, to tell who else did it, tells you, "I talked to the guy for two and a half hours. I listened to him. I looked him in the eye. It's his voice on that video.
(R.R. Vol. 6, p. 19).

Raymer argues that the Dollar General employees did not testify and that the only testimony about their photo lineup identification was from Detective Fikes. Raymer notes that Shimek attempted to argue that allowing the prosecutor to argue Detective Fikes's testimony violated Raymer's right to confront the witnesses, but did not follow through with his argument. Raymer argues that the state's case revolved around the photo lineup identification these Dollar General employees.

If a defendant unsuccessfully objects at trial to statements in a prosecutor's argument, the standard of review is generally abuse of discretion. *United States v. Gracia,* 522 F.3d 597, 600 n.2 (5th Cir. 2008) (citations omitted). If there is no contemporaneous objection, review is for plain error. *Gracia,* 522 F.3d at 600 n.2 (citations omitted). Even if the defendant can meet the burden of showing that error was plain and affected substantial rights, a court has "discretion to decide whether to reverse, which we generally will not do unless the plain error seriously affected the

22

fairness, integrity, or public reputation of the judicial proceeding." *Id.* (citations omitted). A reviewing court first decides whether the prosecutor made an improper argument and, if so, whether it affected the defendant's substantial rights. The court assesses "the magnitude of the statement's prejudice," "the effect of any cautionary instructions given," and "the strength of the evidence of the defendant's guilt." *United States v. Gallardo–Trapero,* 185 F.3d 307, 320 (5th Cir. 1999) (citations and internal quotation marks omitted).

Under Texas law, the four permissible areas of jury argument are (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to the argument of opposing counsel, and (4) pleas for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). "[A] prosecutor's closing argument cannot roam beyond the evidence presented during trial: except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *Gallardo–Trapero,* 185 F.3d at 320 (alteration, citation, and internal quotation marks omitted). For "improper comment or questioning to represent reversible error, it generally must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Castillo,* 77 F.3d 1480, 1497 (5th Cir. 1996) (citation and internal quotation marks omitted).

The following is an excerpt of the prosecutor's closing argument:

> So what evidence points to the defendant, Russell Raymer? Why don't we start with the physical evidence? We talked to Mary Garcia; you heard from Mary Garcia. Nice lady. Man comes in, she's scared for her life. She has to realize she has to give the money. Make sure her two-year-old granddaughter doesn't come up because she doesn't want to risk her life. Make sure that the other customer's life in the corner over there that you see on the video doesn't get hurt. All that time, trying to get money and get out. That robbery lasts 45 seconds. It still shakes her to the core. She's got to think of a whole lot of different things at one time. What does she say? She says that the person has a plaid shirt, the person has a mask, the person has dishwashing gloves and a shotgun. She identified

these.  Ladies and gentlemen, there is a finite number of people in the world.  There is only one place that was robbed on April 2, 2005.  Only one Handi Stop.  Plaid shirt, dishwashing gloves, mask, shotgun.  Where did they find the plaid shirt?  They find it in the truck that the defendant is driving.  Do you need DNA off the truck?  No.  They see him leaving out in the truck.  DNA is a red herring.  The plaid shirt is inches away from the defendant.  The mask, inches away from the defendant.  The gloves, inches away from the defendant.

Who else would have the stuff other than the guy driving the truck that matches the description of the guy robbing the store?  There's only two people in the truck: Shane Weldon six-two, 260 – that's my size – and Russell Raymer, five-eight, 160.  They're not confusing the two.  That's just the physical evidence.  That's just part of the physical evidence.  Scissors used to cut the gloves.  And the mask in the truck.  In the truck, inches away from the defendant.  He's got to be the unluckiest guy in the world at this point in time for all of these things.  He just happened to jump into a truck and live at a place where a Dollar General bag was found and a shotgun was two inches from him.  One of the things they tell you, you don't leave your common sense at the door when you become a juror.  You bring those experiences in.  Now that in itself is enough.  The fact of the physical evidence points squarely at Russell Raymer.  He's running from the truck, fleeing.  Why does he have to flee?  He says for a parole warrant.  That's for one dirty urine sample.  How about ag robbery, 5 to 99?  Like he said, he knows he's going down.

We'll get to the confession.   We'll get to that.   The physical description of the suspect.  Mary Garcia says, five-eight, scrawny kind of guy,160 – 150 to 160. Pretty decent description.  Not just anyone fits that description.  Yes, there are other males that fit that.  But other males that were running from the scene?  That were seen running and jumping the fence with a Dollar General bag?  That are in a truck that was ID'd by Francis Guevara who memorized the license plate?  That are seen getting out of the truck and running, evading police?  There are a whole bunch of people on that day doing that?  And we haven't gotten to the confession yet.  The only thing that they can say is the eyebrow-and-eyeball defense.  Eyeballs are blue, eyebrows are blonde.  Now granted, think about what you would be thinking about at that point in time with a shotgun pointed at you and your grandchild in the corner.  There are a lot of things going on in your head.  She got the description wrong on the eyebrows and eyeballs.  I also think that, you know, sometimes people, their eyes change color as well.  She got that part wrong.  Now, does that make her not credible?  No.  She saw what she saw.

24

But the fact that you get one thing wrong? Think about that for a second. Francis Guevara got one number on the license plate wrong. It still came back to the same truck with the shotgun and the gloves and the mask. Ladies and gentlemen, this isn't a perfect science, but this is overwhelming evidence that the same guy who just happened to be in the car that just happened to be in the area of the robbery that just happened to have all the evidence of the robbery in it, and the weapon used, all come back to him. That's a brick wall of evidence pointing towards him. And the defendant's answer is "I was in a fog." He didn't tell you where he was. He didn't tell you what he was doing, but he was in a fog that day. Now think about it. If you're in a fog and you're hazy, it didn't stop him from turning on a dime and running from the police. You saw the video. He's moving all around, jumping over fences. He's not in a fog. That's just an excuse. The evidence points to him and nobody else. The Dollar General bag, why is that important? It's important because Francis Guevara sees a person with a Dollar General bag jumping a fence jumping into a truck. Why is that important? Because the people at the Dollar General store, as you heard from Detective Fikes, say they saw the defendant buying these gloves. They picked him out. Not only that. He confesses to going to the Dollar General store to buy these gloves. Now defense counsel wants to say maybe it was in the newspaper. But they don't remember conversations. And if it's in the newspaper, why did the defendant confess to it? This is overwhelming evidence, and we still haven't gotten to the confession. The video. One thing that you can tell on the video is that a person is talking. Now, Detective Fikes – a guy with no dog in the fight, a guy that works major crimes, not dirty urine cases – gave the defendant every chance to name somebody else, to tell who else did it, tells you, "I talked to the guy for two and a half hours. I listened to him. I looked him in the eye. It's his voice on that video. And I can tell you whose voice it's not, the other person who possibly could have committed the crime, Shane Weldon" – who, by the way, doesn't fit any of these descriptions. All of this evidence, all of what you would call circumstantial evidence, the physical evidence, all the common sense evidence – mandates a guilty verdict. But that's not all we have because you saw in your own – with your own eyes – and you listened with your own ears to the defendant confess to the crime.

(Docket Entry No. 10-14, pp. 6-8).

Raymer first alleges that the prosecutor tried to bolster the credibility of Detective Fikes by stating that he had "had no dog in this fight." If this statement could be considered bolstering, which

is doubtful, it certainly was not "so pronounced and so persistent that it permeate[d] the entire atmosphere of the trial." *United States v. Castillo,* 77 F.3d at 1497.

Raymer alleges that Detective Fikes gave hearsay testimony about the Dollar General employees' identification of Raymer as the robber.  At trial, Detective Fikes testified, in relevant part,  as follows:

> Q.    Did you ask [Raymer] about, and did he tell you about where the yellow gloves came from, how he came to have those gloves?
>
> A.    I remember he told me either the Family Dollar or the Dollar General, which is downtown Bryan on Main Street.
>
> Q.    Did he tell you who went in the store, who bought those gloves?
>
> MR. SHIMEK:  Objection, leading.
>
> THE COURT: How does that question suggest the answer? Overruled.
>
> Q.    (By Mr. Thomas) Did he tell you who went to that store and bought the gloves?
>
> A.    He stated that Shane did.
>
> Q.    Did he say anybody else was with Shane?
>
> A.    He stated that he was with him.
>
> Q.    Okay.  Did you ever talk to anybody that worked at the store?
>
> A.    Yeah, I went back and talked to the manager of the store and the clerk at the store.
>
> Q.    Through your investigation with them, did they ever confirm that Mr. Raymer was in the store?
>
> MR. SHIMEK:  Objection, hearsay.
>
> THE COURT:  Sustained.

Q.      (By Mr. Thomas) Mr. Raymer told you he was in the store and bought some yellow gloves?

A.      I believe so, yes.

Q.      That was at the Dollar General store in Bryan?

A.      Right.

Q.      Through your investigation, did you, after that, subsequently prepare a photo lineup of Mr. Raymer?

A.      Yes, sir, I did.

Q.      What is a photo lineup, briefly?

A.      A photo lineup, usually we get six different individuals who are similar in stature, age and race and put them together; six different photos to show a possible witness or victim in a crime to identify a possible person or perpetrator.

MR. SHIMEK:  May we approach?

THE COURT:  Yes, sir.
(At the bench.)

MR. SHIMEK:  I object.  The response calls for a hearsay response. If he's going to ask what person was picked out of the lineup, the answer he's going to give, the answer is going to be clearly hearsay.

MR. PARSONS:  It's not hearsay. He can say –

MR. SHIMEK:  He's not the person who identified him.

MR. PARSONS:  It isn't hearsay.  Hearsay would then be equivalent to saying a person that testified to the defendant's admissions is the defendant.  It would be a hearsay statement, but courts have said it's not hearsay.

THE COURT:  Okay. If they asked him for identification.

MR. PARSONS:  Judge, it wouldn't be a hearsay statement.  It would be a statement at that point in time.  It would just be his prior ID.

THE COURT:  Let's let the jury take a short break.

27

(End of bench conference.)

. . . .

(Out of the presence of the jury.)

THE COURT:  A witness' own previous statement is hearsay.  I mean, if any John Doe gets up there and says: On such and such a date I said this.  That's still hearsay.  Even if a person says during trial, 801(e)(1)(c): Prior statement by witness.  "That declarant testifies at trial or hearing and a subject of cross-examination concerning the statement and the statement is one of identification of a person made after preceding the person."  That means if he previously identified it, then he could testify now about his previous identification.  The annotation – I'm looking on Page 485 here.

MR. PARSONS:  I don't have the Texas Criminal – I can see that.

THE COURT:  Page 485 of the annotation says, Rule 801(e)(1)(c) permits – showed that a witness identified a person such as the accused in a criminal case on a previous occasion.  So it doesn't mean that he can testify about what somebody else did as far as identifying. It has to be done in person.

MR. PARSONS:  I have done this before; the same thing with photographic lineups.

MR. SHIMEK: Well, it's been wrong before.  It hasn't been objected to, as far as I'm concerned.

MR. PARSONS: (Reading to himself, sotto voce) – "part of testimony by the identified witness, another person who was present such as a police officer may testify to previous identification." That's from case law.

THE COURT:  That's from case law, all right.  I didn't read far enough.  Sounds like it's right on point.

MR. SHIMEK: Judge, I think that's going to be if that person is here to testify as a witness.

THE COURT:  Let me look at that again.

MR. PARSONS:  We have that person under subpoena to come and testify tomorrow.  I'm saying that they don't have to be here to identify to that.  The police officer can say, "Who did they pick out? They picked out No. 3."

28

THE COURT:  I think in this case that he cited, the U.S. vs Elemy case, I think that he's correct.  I'll overrule the objection.

. . . .

(Open court, defendant and jury present.)

THE COURT:  Please be seated.

MR. SHIMEK:  I would ask for a running objection to this line of testimony in regard to photo identification lineup.  I again renew my objections made earlier in general.

THE COURT:  You are given a running objection.  Go ahead.

Q.   (By Mr. Thomas) Detective Fikes, let me ask you this first: When you spoke to Mr. Raymer, who told you about going to the Dollar store and buying gloves, did he tell you when he did that?

A.   If I remember correctly, he said just before, maybe an hour before the robbery occurred.

Q.   So the same day as the Handi Stop robbery?

A.   Yes.

Q.   Did you take a picture of Russell Raymer and was a photo lineup developed with Russell Raymer's photo?

A.   Yes.  I took it to the Brazos County Jail, and I usually get with Sergeant White, who is over in the booking area down in the jail.  He usually composes all of our photo lineups for us when he is available. It's very rare that we do one on our own.  They have such a large data base and it's easier for them because they have the software and whatnot to do the photo lineups, so we do most of our requests through the sheriff's department to get our photo lineups.

Q.   How many separate pictures of different people go into a photo lineup?

A.   Six.

Q.   Do you try to find six people who look as much alike as possible?

29

A.      Yeah.  They look for similar hairstyles, similar facial hair; whether they have it, whether they don't.  Also they try to get similar size, similar shape, height, weight.  They also try to get similar age.

Q.      Okay.  Was that done in this case?

A.      Yes, sir, it was.

Q.      Did you then a few days later go to Dollar General, go to those witnesses at Dollar General and show them that photo lineup?

A.      Yes, sir, I did.

Q.      Did you show it to Jason Finkle?

A.      Yes, sir, I did.

Q.      He is an employee of Dollar General?

A.      He was actually manager at the time.

Q.      Was he able to pick somebody out of the photo lineup as being at Dollar General?

A.      Yes, he was.

Q.      Who did he pick out of the six photos?

A.      The first one he picked out was Russell Raymer.

Q.      Did he then sign a form saying, "I have picked out No. 3"?

A.      Yes, sir. It should be attached in that bag there.

Q.      You watched him sign that form?

A.      Yes, sir, I did.

Q.      Did you also show that same photo lineup to Minnie Sanders?

A.      Yes, sir, I did.

Q.      Did you show this to them separately and apart from each other?

30

> A.      Yes, sir.  I showed it to them in the back office.  I took Jason back there first and had him look at it.  Minnie was still working up front.  After showing it to him, I went and got Minnie and walked her back there out of Jason's view.
>
> Q.      Did Minnie Sanders pick someone out of the photo lineup that she recognized from being in the store?
>
> A.      Yes, sir, she did.
>
> Q.      Who did she pick?
>
> A.      She immediately picked No. 3, which would have been Russell Raymer.
>
> Q.      Did she also sign a form to that effect?
>
> A.      Yes, sir, she did.

(Docket Entry No. 10-12, pp. 17-19).

In argument, the prosecutor summarized the physical evidence linking Raymer to the robbery.  He noted that Mary Garcia's testimony about the robber's physical description and that he was wearing yellow gloves matched Raymer.  The license number Susan Guevara gave police matched the license on the truck Raymer was driving except for one digit.  Susan Guevara also testified that she saw Raymer with a yellow bag.  Detective Fikes testified that two employees from the Dollar General store identified Raymer from a photo lineup as the one who bought yellow gloves at the store on the day of the robbery.  Even if this testimony was improperly admitted, this testimony was cumulative of Raymer's videotape confession admitting buying the yellow gloves at the Dollar General store about an hour before the robbery of the Handi-Stop on April 4, 2005.  The testimony is also unlikely to have altered the outcome, given the testimony of eyewitnesses and the evidence that police recovered a homemade mask, yellow gloves, and a plaid shirt from Raymer's truck.

Shimek objected to Detective Fikes's testimony.  The trial court overruled his objection but allowed him a running objection.  Shimek's decision not to object again during the argument was strategic and not to be second-guessed.  *See, e.g., Hernandez v. Thaler,* 463 F. App'x 349, 356 (5th Cir. 2012) (counsel's decision not to object to prosecutor's statement in closing that suggested the victims' families would want a death sentence was not an unreasonable trial strategy when voicing an objection might, for example, undermine the legitimacy of the lawyer's own emotional appeals to spare his client's life); *Charles v. Thaler,* 629 F.3d 494, 502 (5th Cir. 2011) (counsel's decision not to object to adverse witness testimony was not an unreasonable trial strategy when objecting would draw undue attention to harmful testimony); *Hernandez v. Thaler,* 398 F. App'x 81, 87 (5th Cir. 2010) (counsel's decision not to object to the prosecutor's mischaracterization of witness testimony during closing argument was not unreasonable when objecting would draw undue attention to that testimony); *see also Drew v. Collins,* 964 F.2d 411, 423 (5th Cir. 1992) (noting, in a pre-AEDPA case, that a "decision not to object to a closing argument is a matter of trial strategy"). Shimek's decision to forgo objection to the prosecutor's remarks about the Dollar General employees' identification of Raymer in the photo lineup was reasonable in light of his prior running objection and the fact that objecting during the prosecutor's fleeting reference to the identification in closing argument would merely draw attention to it.  *See, e.g., Rivas v. Thaler,* 432 F. App'x 395, 404 (5th Cir. 2011) (state habeas court was not unreasonable in determining that lawyer's decision to "object as little as possible on cross-examination in order to appear open and honest with the jury" was not unreasonable trial strategy).  Shimek could reasonably have concluded that any objection would have been futile and unnecessary given that Raymer had admitted purchasing the yellow gloves from the Dollar General store before the robbery.

Raymer has not rebutted the state habeas court's findings that Shimek's failure to object at argument was neither deficient nor prejudicial. The state court's decision reasonably applied the law to the facts, consistent with clearly established federal law. Raymer has not shown a basis for relief on this ground. 28 U.S.C. § 2254(d)(1).

**IV.    The Claim Based on Prosecutorial Misconduct**

Raymer alleges that the prosecutor made prejudicial comments during voir dire. Raymer refers to the following exchange:

> Like I said, what we're dealing with today, the twelve people who remain on this jury will decide on this case. As the Judge told you, myself and Mr. Parsons are both assistant district attorneys in the DA's office here in Brazos County. That's all we do is prosecute felony cases in this court right now. Thank you for being here, ahead of time. This is an important case. All the cases are important. It's important to the defendant, it's important to the State, its important to the community, it's important to the victims in this case and it's important to a lot of people. That's what the twelve of you who are here who decide this case – you have to remember both parties, the State and defendant and how important it is to them. That's why we need twelve people to decide this case, based only upon this case, and nothing you're bringing in here – any baggage you're bringing in court today – to make sure it doesn't affect you if you wind up over here. This case is important as well because of the type of case you're hearing, an aggravated robbery. You know it's an important case. And how this case is decided will also show this community how this community is going to deal with this type of case. It's a violent case –
>
> MR. SHIMEK:  Objection, Your Honor. Argumentative.
>
> THE COURT:  Overruled. Go ahead.
> MR. THOMAS:  If you're chosen as jurors, you're to effectively decide this case so the community – if this case is proven – how the community feels about this type of crime, how we can defend ourselves and how we can hold people accountable for their actions.

(Docket Entry No. 10-9, p. 4). Raymer argues that the prosecutor improperly called on jurors to act as the community's conscience.

33

Prosecutorial misconduct, including impermissible statements during jury voir dire, is analyzed in two steps: (1) whether the prosecutor made an improper remark; and (2) whether the prosecutor's remarks prejudiced the defendant's substantial rights by casting serious doubt on the correctness of the jury verdict. *United States v. Valencia,* 600 F.3d 389, 409 (5th Cir. 2010). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). A trial is fundamentally unfair "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Riddle v. Cockrell,* 288 F.3d 713, 720 (5th Cir. 2002) (internal quotation marks omitted).

The prosecutor's comments did not amount to an improper request to the jury to serve as the community conscience. "It is well-settled that, unless the prosecutor intended to inflame, 'an appeal to the jury to act as the conscience of the community is not impermissible.'" *United States v. Ruiz,* 987 F.2d 243, 249 (5th Cir. 1993) (citation omitted). There is no indication that the comments were designed to inflame the jury. The prosecutor's statements about the jury's role were not improper. The Fifth Circuit has held that "[a]though the prosecution may not appeal to the jury's passions and prejudices, the prosecution may appeal to the jury to act as the conscience of the community." *United States v. Davis*, 609 F.3d 663 (5th Cir. 2010) (citing *Jackson v. Johnson,* 194 F.3d 641, 655 & nn.54-56 (5th Cir. 1999)).

Even if the comments could be viewed as improper, they did not come close to infecting the trial with unfairness or present a reasonable probability that they altered the outcome. The judge instructed the jury that the arguments of the prosecutor and defense counsel did not constitute evidence, and jurors are presumed to understand and follow the court's instructions. *See United*

*States v. Patino-Prado,* 533 F.3d 304, 313 (5th Cir. 2008).  This presumption can be overcome only

when there "is an overwhelming probability that the jury will be unable to follow the instruction and

there is a strong probability that the effect is devastating."   *Id.* (quoting *United States v.*

*Barksdale-Contreras,* 972 F.2d 111, 116 (5th Cir. 1992)).  Raymer has made no such showing.

Raymer raised this issue on state habeas review.  The state habeas court rejected the claim,

stating:

> (uu)    In ground six, Applicant claims that the State's comment
> during voir dire – that this case and how the community would deal
> with this type of case was important – violated his constitutional
> rights.  *See* Application at 11.
>
> (vv)    The State, at the beginning of voir dire, stated that the
> aggravated robbery was an important case to determine how the
> community would deal with this type of case, and Applicant objected
> that it was argumentative when the State referred to it as a violent
> case.  (2 RR 7).  The Court overruled the objection, and the State
> noted that if the case is proven, the jury will be asked to determine
> "how the community feels about this type of crime, how we can
> defend ourselves and how we can hold people accountable for their
> actions."  (2 RR 7).  Applicant did not further object.  (2 RR 7).
>
> (ww)    Applicant did not preserve his claim for appeal by lodging a
> comporting objection, and even had he raised the issue on appeal, it
> is well-settled that the writ of habeas corpus should not be used to
> litigate matters which should have been raised on direct appeal.  *See*
> *Ex parte Banks,* 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).
>
> (xx)    Even had Applicant properly objected, raised the issue on
> appeal, and the comment occurred during the State's argument, the
> State never said what the community wished for, did not say that the
> community wanted Applicant to be convicted, or even suggest a
> punishment or urge that it should be severe.  *See Crawford v. State,*
> 511 S.W.2d 414, 417 (Tex. Crim. App. 1974); *see also Horn v. State,*
> 505 S.W.2d 269, 270-71 (Tex. Crim. App. 1974) (noting that an
> argument that "there are a lot of people that are going to be waiting
> to see what the jury does about this case" is not a comment on
> expectations of the community).

(Docket Entry No. 11-19, p. 62).

The record provides no basis to find that Raymer has rebutted the presumption that the state court's factual findings are correct.  28 U.S.C. § 2254(d)(2).  The state court's decision was a reasonable application of the law to the facts and was not contrary to clearly-established federal law as determined by the Supreme Court of the United States.  Relief cannot be granted under 28 U.S.C. § 2254(d)(1) on this ground.

## V.     The Claim Based on the Confrontation Clause

Raymer alleges that the trial court erred by allowing Detective Fikes to offer hearsay testimony about the two Dollar General employees who identified Raymer in a photographic lineup. The employees did not testify in court.  The record shows that defense counsel objected to this testimony, but the trial judge overruled the objection.  Raymer not only claimed ineffective assistance of counsel in failing to prevent this testimony—a claim this court rejected above—but also that the admission violated his Confrontation Clause rights.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In *Crawford v. Washington,* 541 U.S. 36, 53–54 (2004), the United States Supreme Court held this bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  Whether statements are subject to the Sixth Amendment's Confrontation Clause is determined by whether they are "testimonial."  *See Davis v. Washington,* 547 U.S. 813, 817 (2006).  "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  *Id.*  Statements to police officers are not testimonial when made under circumstances objectively indicating that the primary purpose is to enable police to meet an ongoing emergency.  Statements are testimonial when the circumstances objectively

indicate that there is no such ongoing emergency, and that the primary purpose of the police interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id.,* 547 U.S. at 822-826. If the statement was testimonial and the federal habeas court finds constitutional error, the court measures any prejudice by the "substantial and injurious effect" standard of *Brecht v. Abrahamson,* 507 U.S. 619 (1993). *See, e.g., Hughes v. Quarterman,* 530 F.3d 336, 345 (5th Cir. 2008).

In *Taylor v. Cain,* 545 F.3d 327 (5th Cir. 2008), a law-enforcement officer testified that at the crime scene, an individual slipped him a note that he wanted to talk. The officer testified that he had a conversation with this individual and learned information that ultimately led to identifying the defendant as the assailant. *Taylor,* 545 F.3d at 331. The Fifth Circuit found a Confrontation Clause violation. The officer testified about highly incriminating information from an unidentified eyewitness and the prosecutor referred to that testimony in closing argument. In finding that admission of the hearsay testimony was not harmless, the Fifth Circuit emphasized that evidence of guilt was "far from overwhelming." There was no physical evidence linking the defendant to the crime and only one witness who did so. That witness had credibility and corroboration issues. As a result, "the comment attributed to the nontestifying witness was critical, as the other evidence was not at all overwhelming. *Compare Wilkerson v. Cain,* 233 F.3d 886, 891-92 (5th Cir. 2000) (habeas relief warranted where defendant could not effectively cross-examine a witness "crucial to the prosecution's case"), *with Burgess,* 350 F.3d at 472 (harmless error where there was "a wealth of evidence validly in the record that provided overwhelming evidence of Burgess's guilt"), *and Cotton v. Cockrell,* 343 F.3d 746, 752 (5th Cir. 2003) (describing the "sea of evidence" incriminating the defendant)." *Taylor v. Cain,* 545 F.3d at 336-37; *see also United States v. Silva,* 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations, and thus spread

before juries damning information that is not subject to cross-examination . . . would eviscerate the constitutional right to confront and cross-examine one's accusers.").

Unlike *Taylor*, the evidence of guilt in this case was ample and strong. Several eyewitnesses identified Raymer. He admitted buying the yellow gloves that were found in his truck after the robbery. He fled, led police on a chase, and then ran on foot, leaving incriminating physical evidence in his truck. He confessed. The prosecution's case did not depend on the photographic lineup identification that Detective Fikes described. Any error in admitting Detective Fikes's testimony about the lineup was harmless.

The state court's decision rejecting the Confrontation Clause claim reasonably applied the law to the facts, consistent with clearly established federal law. Raymer has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## VI.    The Claim Based on a Fifth Amendment Violation

Raymer argues that admitting the confession he gave to law enforcement violated his *Miranda* and fair-trial rights under the Fifth Amendment. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, the right to remain silent, and that anything that the person says may be used against him. *Id.* at 444-45. A person may waive these rights, so long as the waiver is knowing and voluntary. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). And during custodial interrogation, "the right to have counsel present . . . is indispensable to the protection of the Fifth Amendment privilege." *Id.* at 469. When a suspect declares that he wants an attorney, "the interrogation must cease until an attorney is present." *Id.* at 474; *see also Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (holding that once "an accused has invoked his right to have counsel present during custodial interrogation . . . [he] is not subject to further interrogation

38

by the authorities until counsel has been made available," unless he initiates the contact). *Id*. at 484-485. The *Edwards* rule prevents police from badgering a defendant into waiving his previously asserted *Miranda* rights" by presuming later statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). This rule "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence." *Texas v. Cobb*, 532 U.S. 162, 173 (2001) (Kennedy, J., concurring).

Once a suspect invokes his right to counsel, police officers try to elicit statements from that suspect unless he initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Ambiguous assertions of the right to counsel do not require police to stop questioning. *See Barnes v. Johnson*, 160 F.3d 218, 224 (5th Cir. 1998) (finding no invocation of right to silence when viewed in light of the suspect's prior statements and the fact that the suspect initiated discussion with police after hearing and waiving his *Miranda* rights).

Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *Colorado v. Connelly,* 479 U.S. 157, 163–67 (1986). While a defendant's mental condition, including intoxication, "may be a significant factor in the voluntariness calculus, this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness." *Connelly,* 479 U.S. at 164; *United States v. Raymer,* 876 F.2d 383, 386 (5th Cir. 1989).

During the suppression hearing, Detective Fikes testified that he had two separate interviews with Raymer. The first interview lasted one hour and 37 minutes. After the first interview ended, Raymer asked to speak with Detective Fikes. The second interview lasted 51 minutes. Detective

39

Fikes testified that he read Raymer his *Miranda* rights before each interview.  Detective Fikes testified that during the second interview, Raymer asked for a hamburger and a drink, and arrangements were made to provide them.  (Docket Entry No. 10-10, p. 9).  Detective Fikes testified that Raymer asked for a shirt because he was cold; Raymer had discarded his shirt during the foot chase.  The shirt had been marked as evidence and deposited in the property room, and Detective Fikes did not have any other shirts available to give Raymer.  (Docket Entry No. 10-10, p. 11).

During cross-examination, Detective Fikes testified that in the interrogation, he had told Raymer, "I'm trying to help you.  I don't want to see you go down for something you didn't do." Detective Fikes acknowledged that he may have said, "God was watching you and God knows everything, and you should tell the truth because of that.  (Docket Entry No. 10-10, pp. 11-12). Detective Fikes denied that Raymer appeared to be intoxicated.

Raymer testified at the suppression hearing as follows:

> Q.     Russell, you have reviewed those interviews, watched the videos. Is that correct?
>
> A.     Yes.
>
> Q.     Were you intoxicated at the time those were taken?
>
> A.     I was – I wasn't actually intoxicated.  I was coming down off an intoxication of being up for three or four days doing drugs.  And the euphoria of actually of being intoxicated – no, I was – I couldn't – it was like a fog.
>
> Q.     And in reviewing the tapes, going through there, do you believe that you were coerced into giving that confession?
>
> A.     Yes, sir.
>
> Q.     Were you first of all promised food?
>
> A.     Yes, sir.
>
> Q.     How long had it been since you had anything to eat?

40

A.      Three days.

Q.      Do you know how it came about or do you recall or remember how it was that the officer promised to give you food?

A.      I'm not sure, but I asked – I had asked at the jail if they had a sandwich.  And now that – I guess it's Officer Williams, the arresting officer – he said if I would talk to Detective Fikes they would  provide me with a hamburger and fries.

Q.      Do you believe or do you recall – do you believe that you invoked your right to counsel?

A.      Yes, sir.

Q.      When do you believe that you did this?

A.      I'm not sure.  I believe maybe twice before I said anything. I believe that was one of the first things come out of my mouth. Because at the jail, whenever he came to see me, I asked him, "I want to see an attorney," you know.  And I had eaten and had some sleep. I know I had said something to that effect that night.

Q.      But that wasn't recorded on the copies of the tapes we've seen.  Correct?

A.      No, sir.

Q.      You believe that you did that before you were ever questioned at all?

A.      Yes, sir.

Q.      Did the questioning continue?

A.      Yes, sir.

Q.      Did you feel that you had any choice but to answer those questions?

A.      No, sir.  I was in custody.  Like I said, most of that is false.

Q.      When they brought you to the jail, did they ever give you any clothes to change into, any kind of shirt to put on?

41

A.     No, sir.

Q.     How much longer did you sit at the jail?  Again, before the officer talked to you the second time.

A.     I remember I crawled up underneath a bench in that holding cell.  I crawled up underneath there without a shirt on, on that cold floor and was able to go to sleep.  I was gone.  Like I said, I was out of it.  It was a while later, I guess.  I couldn't actually tell you the time or anything like that, sir.

Q.     How was it – or do you recall how it was that you then asked for food again and were denied that?

A.     I remember them taking me up and an officer fingerprinting me – and I guess it would be Officer Williams, the arresting officer.  I don't know.

Q.     Were you told that you would get some food if you went and made a statement to the officers?

A.     That officer that was booking me said if I would talk to Detective Fikes I would be able to get a burger and fries.  That was his exact words as a matter of fact.

Q.     In fact, did the burger and fries arrive, and were they in your view and in your presence before you actually were given the burger?

A.     I'm not sure about – you know, the – like I say, a lot of that is foggy to me.  But during that there is – and if I'm not mistaken, there is a table and there is a door.  But there is a window to – I guess it would be to the right, right of that.  I'm sitting in one position and I kept seeing movement, you know.  I asked him, I said – I'm not really sure.  I believe I asked him, "Is that my burger out there?"  I'm not sure.

Q.     He still wouldn't give you the burger until you started to confess.  Is that correct?

A.     I believe that's the way it happened.

(Docket Entry No. 10-10, pp. 14-15).

Raymer was advised of his *Miranda* rights before questioning, and he agreed to speak with

Detective Fikes.  Although Raymer alleges that he was questioned under coercive conditions and

was cold and hungry, there is no indication of any coercion. When Raymer asked for food, Detective Fikes made arrangements to get Raymer the hamburger and drink he asked for. When Raymer asked for his shirt, Detective Fikes tried to get it, but it was locked in the property room. The state trial court did not credit Raymer's testimony that he was coerced, and there is no basis to disregard that court's finding. *United States v. Garza,* 118 F.3d 278, 283 (5th Cir. 1997).

Raymer testified that he was coming off a three-day drug spree, but that he was not "actually intoxicated" when questioned. Detective Fikes testified that Raymer did not appear intoxicated. Detective Fikes testified that Raymer appeared to understand his rights and the implications of waiving them and that he gave coherent responses to the questions asked. *See United States v. Reynolds,* 367 F.3d 294, 299 (5th Cir. 2004) (concluding that district court did not err in denying motion to suppress when the defendant was cooperative, listened to questions, and responded logically and appropriately); *United States v. Solis,* 299 F.3d 420, 438–39 (5th Cir. 2002) (affirming district court's findings that confession was voluntary when the police officer testified that there was no indication that defendant was under the influence of controlled substances and was responsive to questions). While Raymer told officers during his interview that he was addicted to drugs, he did not tell the officers that he was under the influence of controlled substances at that time. Detective Fikes had no reason to suspect that Raymer could not competently waive his rights, and there is no evidence that Detective Fikes exploited intoxication.

The record does not support any inference that Raymer's waiver of his *Miranda* rights was involuntary because his alleged mental condition or drug use was exploited or prevented him from understanding the consequences. *See Moran v. Burbine,* 475 U.S. 412, 421 (1986) (noting that waiver must be made voluntarily and with full awareness of the rights being abandoned and the consequences of abandonment). Nor is there any support for an inference that Raymer was so

impaired when questioned that his statement was not knowingly, intelligently, or voluntarily given.

The totality of the circumstances do not show that Raymer's confession was coerced or involuntary.

*See Foy,* 28 F.3d at 474; *Connelly,* 479 U.S. at 163–67.  He has not shown that the district court

erred in denying his motion to suppress.

The state habeas court found as follows:

> (cc)   This Court considered evidence in a hearing on the motion to suppress, and it reviewed the video of Applicant's two interviews that occurred the evening of his arrest at Shimek's urging.  *See* Defendant's Exhibits Nos. 1- 2.  In the first interview conducted by Fikes, Applicant waived his *Miranda* rights, denied any involvement in the robbery, and suggested the officers could find anything they needed to know in Weldon's apartment.  (3 RR 21-23).  While obtaining a search warrant for that apartment.  Applicant called Fikes, stating he wanted to talk and tell the truth and asked for him to bring him a burger and drink.  (3 RR 24-27).  Appellant admitted to the offense in that interview after reviewing his *Miranda* rights again.  (3 RR 25-26).  Fikes did not threaten Applicant or withhold the food in exchange for a confession.  (3 RR 27-28, 37).  Fikes did not believe Applicant appeared intoxicated in the interviews, and Applicant even said that he was not.  (3 RR 34, 38, 42).  At the end of the interview, Applicant asked him to put in a good work[sic] for him at punishment time.  (3 RR 30).

> (dd)   In the motion to suppress hearing, Applicant testified he invoked counsel, maybe, twice before he would speak to the police and that they told him he could get a burger and fries only if he spoke to Fikes.  (3 RR 45-49).  He was cold because he had removed his shirt when he fled and the officers did not provide him a shirt.  (3 RR 46-47).  He also believed that references to God watching him pressured him into  making a statement.  (3 RR 48-49).  Applicant also stated that he was not actually intoxicated: he "was coming down off an intoxication of being up for three or four days doing drugs . . . the euphoria of actually being intoxicated – no, I was – I couldn't – it was like a fog."  (3 RR 44).

> (ee)   After watching the videos, this Court found that Applicant "seemed lucid, cogent, coherent."   It was not persuaded that Applicant was intoxicated, and [e]ven if he was, not to any level that would interfere with his thinking."  (3 RR 85).  Applicant was properly advised of his *Miranda* rights, he had plenty of time to eat, and was casually talking about the things the detective asked.  (3 RR

85-86).  The trial court found the statement admissible under State and Federal law, and it denied the motion to suppress.  (3 RR 86).

(ff)     Voluntariness of the confession was also an issue presented for the jury to consider when it assessed guilt or innocence, instructing it not to consider the statements Applicant made in jail if it was freely and voluntarily made without compulsion or persuasion. *See* Exhibit No. 5 at 3 (charge of the court).

(Docket Entry No. 11-19, pp. 56-57).

In light of the record, the trial court's admission of the videotaped statement is not contrary to "clearly established Federal law, as determined by the Supreme Court."  28 U.S.C.A. § 2254(d)(1).  Based on Fifth Circuit precedents and the specific circumstances in this case, this court cannot conclude that the state courts unreasonably applied clearly established federal law in concluding that Raymer's confession was admissible.  This court cannot conclude that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  Raymer is not entitled to federal habeas corpus relief on this claim.

## VII.    The Claim of Ineffective Assistance of Counsel on Appeal

A claim of ineffective assistance of counsel on appeal requires the petitioner to show that counsel gave deficient assistance and that had counsel performed differently, the appeal would have raised issues and arguments of merit.  *Sharp v. Puckett,* 930 F.2d 450, 453 (5th Cir. 1991), *citing Strickland,* 466 U.S. at 687;  *Smith v. Robbins,* 528 U.S. 259, 285 (2000) (holding that the petitioner must first show that his appellate attorney was objectively unreasonable in failing to find arguable issues to appeal, and also a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief raising these issues, he would have prevailed on his appeal).  *See also Williams v. Taylor,* 529 U.S. 362 (2000); *Briseno v. Cockrell,* 274 F.3d 204, 207 (5th Cir. 2001).

45

Appellate counsel's failure to raise certain issues on appeal is not ineffective assistance if the petitioner does not show trial errors with arguable merit. *Hooks v. Roberts,* 480 F.2d 1196, 1198 (5th Cir. 1973). Appellate counsel is not required to consult with his client about the legal issues to be presented on appeal. *Id.* at 1197. An appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits. There is no need to raise every conceivable issue on appeal. *Jones v. Barnes,* 463 U.S. 745, 749 (1983).

Raymer alleges that his appellate counsel was ineffective for failing to challenge the admission of Detective Fikes's statement that two witnesses identified Raymer in a photo lineup. This court has found Raymer's arguments of error to be without merit. Appellate counsel is not ineffective for failing to raise meritless issues. *Robbins,* 528 U.S. at 285; *Hook,* 480 F.2d at 1198.

Appellate counsel provided an affidavit in the state habeas proceedings, which the state habeas court found to be credible. Appellate counsel testified as follows:

> My name is David Barron. I have been licensed by the Texas Bar since 1981 and have practiced criminal law almost exclusively during my legal career. My experience includes 12 years as a prosecutor and almost 19 years as a defense lawyer. I have been appellate counsel on numerous cases during my career.
>
> I represented Applicant on appeal from his aggravated robbery conviction in Brazos County, Texas in Cause No. 05-04416-CRF-272. The conviction was affirmed by the Tenth Court of Appeals in Cause No. 10-06-00354-CR.
>
> In GROUND EIGHT of his writ, Applicant faults appellate counsel for failing to "raise the denial of applicant's Sixth and Fourteenth Amendment Confrontation Right" as it relates to purported hearsay statements by Jason Finkle and Minnie Sanders referenced in GROUND SEVEN. Applicant alleges that the record reflects Bryan Police Detective Darrell Fikes testified that these two witnesses told him that Applicant was present at the Dollar General Store and had purchased yellow dishwashing gloves (that were used in the robbery). However, from my review of the record at RR-IV, 204-206, it appears that the Court sustained the defense objection to a general question related to the matter and ordered the jury to disregard the

question and answer.  No motion for mistrial was requested, thus, nothing was preserved for appellate review.  Moreover, trial counsel did not raise a Confrontation Clause objection, thus it was not raised by me on appeal (which appears to be Applicant's complaint in GROUND EIGHT).  As to GROUND NINE, Applicant asserts that appellate counsel failed to raise a hearsay claim concerning Detective Fikes' testimony that two witnesses selected Applicant from a photo lineup.  (RR-IV[,] 180-186).  It appears that the Court erred by overruling the objection.  Due to the passage of time, I cannot recall why I did not raise the issue on direct appeal.  Since there was no contemporaneous federal constitutional Confrontation Clause objection, I may have concluded, in light of Applicant's confession, that the non-constitutional error would be considered harmless by the court of appeals.

The state habeas court found:

(j)    Applicant's appellate attorney, David Barron, filed his affidavit November 27, 2012.  *See* Exhibit No. 6 (affidavit of David Barron).

(k)    The record and Barron's affidavit provide sufficient information for this Court to address all of Applicant's claims.  Barron is also an experience[d] criminal defense attorney, and his assertions explaining his representation of Applicant are consistent with the record and credibly explain his actions.
. . . .

(bbb)   In ground eight and nine, Applicant claims that his appellate attorney rendered ineffective [assistance] by failing to raise stronger issues than the one he did raise.  *See* Application at 13-14.  In ground eight, incorporating the issue raised in his seventh ground regarding admission of testimony that the Dollar General employees witnessed him purchasing yellow dishwashing gloves alleged to have been used in the robber[y], Applicant claims his lawyer should have raised a denial of his right to confrontation claim because the employees were not called as witnesses.  *Id.* at 13.  In ground nine, Applicant claims that his lawyer should have also raised a hearsay ground, challenging the admission of the Dollar General employee's identification of him from a photo lineup through the officer's testimony.  *Id.* at 14.

(ccc)   On appeal, Barron challenged the trial court's admission of rebuttal evidence showing the admission of the extraneous aggravated robbery that occurred at the Tobacco and More store.  *See Raymer v. State,* 2008 WL 2840882, at *2-3.  Specifically, he urged

47

that the similarities between the robberies were insufficient to prove Applicant's signature. *Id.* at *2.

(ddd)   The   argument   Barron   raised,   although ultimately unsuccessful, was not frivolous, and the proof necessary to establish a signature offense was an issue addressed that the Court of Criminal Appeals addressed shortly after the Tenth Court addressed Applicant's claim. *See Segundo v. State,* 270 S.W.3d 79, 88 (Tex. Crim App. 2008) (discussing "signature" offense, and "the mark of Zorro" mode of proving identity).

(eee)   In addressing Applicant's eighth ground, Barron notes Applicant's concern that the Dollar General employees identified him purchasing the yellow dishwashing gloves used in the robbery is unfounded. *See* Barron affidavit at 1. Although the State inquired whether they employees saw Applicant in the store or interacted with them in any manner, this Court sustained Applicant's objections and instructed the jury to disregard. (4 RR 204-206). Applicant did not request further relief, thus Barron did not deem a challenge under the Confrontation Clause raised by the evidence. *See* Barron affidavit at 1-2.

(fff)   In addressing Applicant's   ninth ground, alleging the erroneous admission of Fikes' statement that two witnesses identified Applicant from a photo lineup, Barron believes the trial court erroneously overruled the objection, but he  cannot recall why he did not include the issue on appeal. *See* Barron affidavit at 2. He speculates, however, that he may have concluded that he would not have prevailed under the harm standard for non-constitutional error. *Id.*

(ggg)   To demonstrate ineffective assistance for omitting claims on appeal, an applicant must establish that (1) "counsel's decision not to raise a particular point of error was objectively unreasonable," and (2) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *See Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Ex parte Miller,* 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009). The choice of issues to raise is largely strategic: Appellate counsel need not raise every potentially meritorious issue, but if counsel fails to raise a claim with indisputable merit, which under well-settled law would result in a reversal, an applicant meets his burden. *Id.; see also Ex parte Daigle,* 848 S.W.2d 691, 692 (Tex. Crim. App. 1993) (finding appellate counsel's inadvertent failure to raise an error regarding a well settled issue that is not subject to a harm analysis to constitute ineffective assistance on appeal).

48

(hhh)   Barron's determination that Applicant would not have prevailed had he raised Confrontation Clause challenges (ground 8) to issues surrounding Fikes' testimony surrounding his investigation of the Dollar General employees is not objectively unreasonable. *See* Barron affidavit at 1-2. Barron correctly notes that, amongst other weaknesses, preservation issues would have prevented success on the merits of [a] constitutional claim. *See Davis v. State,* 313 S.W.3d 317, 347 (Tex. Crim. App. 2010) (holding that Confrontation Clause claims are subject to the preservation requirement). Barron was not deficient for failing to raise the issue Applicant urges he should have in ground eight.

(iii)   Further, because this Court refused to admit any evidence other than Applicant's presence in the Dollar General store and Applicant admitted that he purchased the gloves at[sic] was in the store before the robbery, he cannot establish harm. *See Rogers v. State,* 853 S.W.2d 29, 35 (Tex. Crim. App. 1993) (holding any error in admitting the evidence is cured where the same evidence comes in elsewhere without objection). Applicant has not met his burden to establish that Barron was ineffective for not including the issue on appeal.

(jjj)   In Applicant's ninth ground, as Shimek argued at trial, the rationale for overruling Applicant's objection to the photo lineup at trial as a prior statement of identification was inapplicable because neither of the clerks (declarants) testified. *See* TEX. R. EVID. Rule 801(e)(1)(c); *Sarver v. State,* 24 S.W.3d 448, 452 (Tex. App.–Texarkana 2000, pet. ref'd). Nonetheless, had Barron concluded that including a hearsay challenge to the admission that the store clerks identified Applicant in a photo lineup upon a conclusion that the point of error would not prevail because [there was no] constitutional error, as alleged in ground nine, his determination would be reasonable. *See* TEX. R. APP. P. 44.2(b) (requiring non-constitutional error to be disregarded if it does not affect a defendant's substantial rights).

(kkk)   Barron's determination not to include the issue as a ground on appeal is not so indisputable under well established law that it would be considered automatic reversible error. *Miller,* 330 S.W.3d at 624. Nor did Applicant establish that "there is a reasonable probability that he would have prevailed if he had raised" the issue on appeal. *See Ex parte Flores,* No. AP-76,862, 24 (Tex. Crim. App. Dec. 5, 2012) (finding failure to challenge the sufficiency of the evidence on direct appeal not to be ineffective). As in Applicant's eighth ground, numerous factors, excluding the hearsay testimony allowed the jury to conclude that Applicant committed the charged offense, including

49

> Applicant's admission not only to the being in the Dollar General, but his admission to robbing the Handi-Stop. *See Rogers,* 853 S.W.2d at 35. Additionally, the surveillance photographs, apprehension of Applicant with evidence from the robbery, and voice on the video prevented the jury from being missed by the clerks' recollection of him making a purchase before the later robbery. *See Motilla* v. *State,* 78 S.W.3d 352, 356 (Tex. Crim App. 2002) (recognizing that overwhelming evidence can be a factor to be considered in conducting a rule 44.2(b) harm analysis).

(Docket Entry No. 11-19, pp. 52, 63-66).

These findings are presumed correct. 28 U.S.C. § 2254(e); *Marshall v. Lonberger,* 459 U.S. 422, 433 (1983); *Valdez,* 274 F.3d at 948 n.11. Raymer has failed to show that there is a reasonable probability that appellate counsel's work was deficient or that, but for counsel's alleged unprofessional errors, the result would have been different. *Strickland,* 466 U.S. at 694. The CCA rejected these claims when it denied Raymer's state habeas application. The state court's decision reasonably applied the law to the facts, consistent with clearly established federal law. Raymer has not shown a basis for the relief he seeks on this ground. 28 U.S.C. § 2254(d)(1).

## VIII.   Conclusion

The respondent's Motion for Summary Judgment, (Docket Entry No. 16), is granted. Raymer's petition for a writ of habeas corpus is denied. This case is dismissed. Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. . . .'" *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Id.* (citing *Slack v.*

*McDaniel*, 529 U.S. 473, 482 (2000); *Hohn v. United States*, 524 U.S. 236, 248 (1998)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El*, 123 S. Ct. at 1039.  The court must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists.  *Id.*  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims."  *Id.*  Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* at 1040 (citing *Slack v. McDaniel*, 529 U.S. 473, 484).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a certificate of appealability should issue only when the prisoner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Jimenez v. Quarterman*, — U.S. —, 129 S. Ct. 681, 684 n.3 (2009) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001).

51

A district court may deny a certificate of appealability on its own, without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). The court determines that Raymer has not made "a substantial showing of the denial of a constitutional right." A certificate of appealability will not issue.

SIGNED on September 23, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge